THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAGELLAN CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SIMEC ACERO S.A. DE C.V.<br><br>　　　　　Defendant. | Case No. 24-cv-2290 |

## COMPLAINT

Magellan Corporation ("Magellan"), by and through its attorneys, brings this action against Defendant Simec Acero S.A. de C.V. ("Simec Acero"), and alleges as follows:

### NATURE OF THE CASE

1.　Magellan brings this action to recover damages for Simec Acero's sale of certain noncompliant steel bars ("Non-complying Goods"). Magellan, a steel distributor, bought a large number of "special bar quality" steel bars after Simec Acero promised its products were suitable for heat treatment and had internally sound centers. The bars failed to live up to these promises, and Magellan's heat treaters began reporting issues within months of Magellan receiving the Non-complying Goods, prompting Magellan to quarantine the Non-complying Goods while it investigated the scope of the problem.

2.　At significant expense, Magellan tested the Non-complying Goods and confirmed many of the bars Simec Acero sold contained voids, were not suitable for heat treatment, and failed to meet Magellan's specifications. Further, Magellan determined that the failures to comply with Magellan's specifications resulted from the steel production process. Despite admitting the production process was the cause of the issues, Simec Acero refused to refund Magellan's purchase

price or otherwise remedy its failures, and Magellan was forced to reject the Non-complying Goods it bought from Simec Acero, along with steel bars produced at approximately the same time with the same characteristics of the Non-complying Goods.

3. As a direct result of Simec Acero's marketing and sale of the Non-complying Goods, Magellan has suffered actual and consequential damages in excess of $2 million. Magellan brings this action for all monetary damages arising out of Simec Acero's breaches of its contractual obligations, implied warranties, and express warranties.

## PARTIES

4. Plaintiff, Magellan, is a corporation organized under the laws of Illinois, and its principal place of business and domicile is 1650 Lake Cook Rd Suite 300a, Deerfield, IL 60015. In business since 1985, Magellan is a premiere steel distributor of specialty steel and other metallurgical products. Magellan's customers use the steel bars it sources in a variety of applications, including in construction, aviation, automotive, and the oil and gas industry.

5. Defendant, Simec Acero, is a Sociedad Anónima organized under the laws of Mexico with its principal place of business and domicile in Guadalajara, Jalisco, United Mexican States whose primary focus is distributing steel products manufactured at affiliate-owned facilities in Mexico, including production facilities in Guadalajara, Mexico operated by Simec International S.A. de C.V. ("Simec International"). Simec Acero is a wholly owned subsidiary of Grupo Simec, S.A.B. de CV ("Grupo Simec").

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) (diversity of citizenship). The amount in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs, and is between a corporate citizen of Illinois and a Mexican Sociedad Anónima domiciled in the state of Jalisco, Mexico.[1]

7. This Court has personal jurisdiction over Simec Acero. During the relevant time, Simec Acero accepted dozens of purchase orders for thousands of metric tons of steel bars purchased by Magellan that Simec Acero knew would be received in northern Illinois, including the Non-complying Goods. The Non-complying Goods were shipped to locations in Illinois[2] specified by Magellan under the following purchase orders (along with dozens of other shipments from Simec Acero to Magellan warehouses and/or a heat treater in the District):

| Purchase Order | Order Date | Delivery State |
|---|---|---|
| 214368 | March 30, 2021 | Illinois |
| 214369 | April 1, 2021 | Illinois |
| 214467 | April 20, 2021 | Illinois |
| 214468 | April 20, 2021 | Illinois |
| 214801 | August 4, 2021 | Illinois |
| 214803 | August 4, 2021 | Illinois |
| 214858 | September 21, 2021 | Illinois |
| 214946 | November 16, 2021 | Illinois |
| 215206 | March 07, 2022 | Illinois |
| 215237 | March 27, 2022 | Illinois |

8. Agents of Simec Acero also travelled to this District on a number of occasions to discuss the transactions at issue here and sent information about the Non-complying Goods directly to Magellan in this District. For example, Simec Acero communicated price increases, the results of its analysis of the Non-complying Goods, and certifications related to the quality of their steel

---

[1] Under Mexican law, a *Sociedad Anónima* is a corporate form and commercial legal entity with status as a legal person, similar to a U.S. capital stock corporation. Baker & McKenzie, *Doing Business in Mexico* 97, 105 (Carlos Angulo–Para, et al., eds., 2d Ed. 2008) (discussing provisions of Mexico's General Law of Commercial Companies).

[2] While all of the Purchase Orders identify Crystal Lake, Illinois as the delivery address, some of the Non-complying Goods were re-routed to a location in Chicago, Illinois due to a backlog at the Crystal Lake facility.

3

55370022.1

directly with Magellan in this District. Simec Acero also regularly travels to this District to solicit business from customers in Illinois.

9. While the parties negotiated changes to the pricing of steel bars sold under the same specifications as the Non-complying Goods, agents of Simec Acero flew to Chicago to negotiate with Magellan employees in early 2022. The parties met at Magellan's office in Deerfield, Illinois where the parties agreed to a base price increase for bars sold under Magellan's Specifications.

10. After Magellan raised concerns about the Non-complying Goods, several agents of Simec Acero and an agent of Republic Steel, an affiliate of Simec Acero, flew to Chicago in October 2022 to meet with Magellan in an unsuccessful attempt to assuage Magellan's concerns about the Non-complying Goods. In May 2023, agents of Simec Acero again met with Magellan personnel to discuss if they could negotiate a resolution. While Simec Acero personnel and their affiliates at Republic Steel repeatedly represented to Magellan that the issues were isolated and the steel generally complied with Magellan's specifications, Simec Acero refused to stand by their products.

11. As discussed above, Simec Acero has transacted business in this District and has sufficient minimum contacts in Illinois because it knowingly sent the Non-complying Goods, its personnel, and information into this forum so that the exercise of jurisdiction over Simec Acero would not offend the traditional notions of fair play and substantial justice.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) or 28 U.S.C. § 1391(b)(3) as a substantial part of the events or omissions that give rise to this complaint occurred within this District, Simec Acero transacted business in this District, and Simec Acero's activities were intended to and did have, direct, substantial, and reasonably foreseeable effects in this District, or Simec Acero is subject to personal jurisdiction in this District.

55370022.1

**FACTUAL ALLEGATIONS**

13. When steel bars have voids or cracks, they are generally unsuitable for certain types of applications, particularly those applications that call for "special bar quality" bars.

14. Special bar quality ('SBQ') steels are developed for challenging and high stress applications. SBQ steels have thus emerged as the mandatory requirements in various applications like those defined by high speed machining, high stress, and high tensile strength among other finer attributes of engineering and metallurgy.[3]

15. As a result of these factors, when Magellan purchases SBQ bars, it provides its suppliers with detailed specifications to ensure that these bars are free from, among other things, voids and cracks and are suitable for the intensive applications that routinely call for SBQ bars.

**Magellan's Specifications and Simec's Feasibility Analysis**

16. In February 2018, Magellan provided Simec Acero with specifications for "Hot Rolled, Special Quality, and Alloy Steel Bars," titled, "SPECIFICATION MIC 7216" ("Magellan's Specifications").

17. Magellan's Specifications contained details related to all orders Magellan placed for certain types of alloy steel bars, including specifications describing how the bars were supposed to be manufactured, internal soundness, and their suitability (including suitability for heat treatment), among other things.

18. Magellan's Specifications require that the "[b]ars are to be free from porosity, laps, seams, clinking, bursts, voids, flakes, gross non-metallic inclusions, and any other injurious or

---

[3] Global SBQ (Special Bar Quality) Steel Sales Market Report 2022, available at https://www.giiresearch.com/report/qyr1065490-global-sbq-special-bar-quality-steel-sales-market.html

55370022.1

harmful defects" and "[t]he materials shall be suitable for general machining, upset forging, drop forging applications as well as for any subsequent heat treatments."

19. Magellan also sent Simec Acero two addendums: Addendum 31 and Addendum 64. Addendum 31 to Magellan's Specifications, titled, "Hot Rolled, Special Quality, Alloy Steel Bars, Addendum 31: AISI 4140, As Rolled, Untreated, Rounds," ("Addendum 31") provides, in relevant part: "Bars shall be suitable for the production of quenched and tempered bars using a continuous, roller hearth, furnace[.]"

20. Addendum 64 to Magellan's Specifications, titled, "Hot Rolled, Special Quality, Alloy Steel Bars, Addendum 64: AISI 4340, Untreated Rounds," ("Addendum 64") specifies the chemistry (including ranges for the amount of carbon and other elements), "hardenability," and additional requirements for the bars sourced under Addendum 64.

21. Quenching and tempering are processes that strengthen materials, like steel, through heating the material then cooling the material.

22. In response to Magellan's Specifications, Simec Acero's affiliate, Simec International, conducted a "Feasibility Analysis," on Simec Acero's behalf.

23. Following completion of this Feasibility Analysis, Magellan received a document from Simec Acero titled "ANÁLISIS DE FACTIBILIDAD DE FABRICACIÓN/PRODUCTION FEASIBILITY ANALYSIS" ("Feasibility Analysis").

24. The Feasibility Analysis contained warranties related to Simec Acero's ability to supply Magellan with steel bars that complied with Magellan's specifications. It also "accepted" Magellan's Specifications related to "Internal Soundness," "Suitability," and "Ultrasonic Testing."

6

55370022.1

25. For example, the Feasibility Analysis accepted Magellan's Specifications as to the production of "Special Quality, Alloy Steel Bars," i.e., bars capable of being used in the most challenging of applications.

26. Simec Acero expressly warranted that it could supply Magellan with steel bars that were internally sound and would "be totally devoid of any porosity, voids, clinks, pipe and other detrimental defects." Simec Acero also expressly warranted that the bars it produced would be suitable for any subsequent heat treatments.

### Magellan's Purchases from Simec

27. Magellan sent Simec Acero a number of purchase orders for 4140 and 4340 grade steel products, including PO Nos. 214368, 214369, 214467, 214468, 214801, 214803, 214858, 214946, 215206, and 215237 (collectively "Purchase Orders"). The Purchase Orders are attached as Exhibit A.

28. Each of the Purchase Orders required that the steel products Magellan purchased under that order were to be "Produced in Accordance to Specification MIC 7216 and Addendum 31 Thereto" or "Produced in Accordance to Specification MIC 7216 and Addendum 64 Thereto."

29. In June 2021, Simec Acero advised Magellan that it would be unable to fulfill some of Magellan's purchase orders because of production issues affecting larger diameter bars produced by Plant 2. Simec Acero represented that the production issues related to molds that were damaged during the continuous casting process and new parts would need to be obtained. Upon information and belief, in October 2021, Simec Acero began shipping the Non-complying Goods.

### Processing Rejections and Testing of Non-complying Goods

30. In March 2022, Magellan learned that several of the Non-complying Goods failed to meet Magellan's Specifications. After Magellan's heat treater conducted "ultrasonic tests" of

7

the Non-complying Goods, Magellan learned that steel bars Simec Acero sold to Magellan had "centerline defects" (effectively a void inside the bar). Ultrasonic testing is a term that describes non-destructive testing techniques based on the propagation of ultrasonic waves in the object or material tested.

31. Several bars were cut open, which confirmed the results of the ultrasonic testing, which showed centerline defects.

32. Magellan sent samples of the Non-complying Goods to an independent laboratory and Simec Acero for further analysis while Magellan quarantined steel bars Simec Acero sold to Magellan. At the same time, Magellan had more bars tested to determine the scope of any potential problem, and dozens of bars that Simec Acero supplied to Magellan "failed" ultrasonic testing indicating that they had similar issues. These issues were concentrated in AISI 4140 and 4340 grade steel bars that had diameters larger than 4.5" produced at Simec International's Plant 2.

33. By selling steel bars with these issues, Simec Acero failed to comply with Magellan's specifications that required the steel to be free from "porosity, laps, seams, clinking, bursts, voids, flakes, gross non-metallic inclusions, and any other injurious or harmful defects."

34. After determining that the Non-complying Goods failed to comply with the specifications, Magellan rejected the Non-complying Goods.

35. Despite being notified about Magellan's rejection, Simec Acero has not refunded Magellan's wrongfully withheld funds, provided any explanation regarding the root cause of these issues, or agreed to a resolution that appropriately disposes of the quarantined Non-complying Goods. Instead, Simec Acero and its affiliate Republic Steel, who participated in the parties' negotiation at Simec Acero's request, largely refused to acknowledge the existence of these problems and refused to stand by the quality of its materials.

## COUNT I
### Breach of Contract

36. The allegations of paragraphs 1 – 35 are repeated and realleged as if fully set forth in Paragraph 36 of Count I.

37. Magellan issued the Purchase Orders to Simec Acero soliciting Simec Acero to deliver steel products based on the mutually agreed upon specifications.

38. These specifications required Simec Acero to deliver steel that, among other things, had the following qualities:

   a. The "bars are supplied with no internal defects, devoid of any injurious or harmful defects;"

   b. "The bars are to have sound internal centers" and "be totally devoid of any porosity, voids, clinks, pipe and other detrimental defects."

   c. "The materials shall be suitable for general machining, upset forging, drop forging applications as well as for any subsequent heat treatments."

   d. "Bars shall be suitable for production of quenched and tempered bars using a continuous, roller hearth, furnace."

39. Simec Acero accepted these orders and shipped the Non-complying Goods in response.

40. Magellan fully performed all of its obligations under the Purchase Orders.

41. Simec Acero failed to deliver goods that are of the quality and description required by the Purchase Orders and the mutually agreed upon specifications.

42. Simec Acero breached its contractual obligations set forth in the Purchase Orders.

43. Magellan has been damaged as a result, in excess of $75,000 and in an amount to be proven at trial.

## COUNT II
### Breach of Express Warranty

9

55370022.1

44. The allegations of paragraphs 1 – 35 are repeated and realleged as if fully set forth in Paragraph 44 of Count II.

45. Magellan issued the Purchase Orders to Simec Acero soliciting Simec Acero to provide steel products based on Magellan's Specifications that Simec Acero expressly warranted it could meet.

46. These specifications required Simec Acero to deliver steel that, among other things, had the following qualities:

   a. The "bars are supplied with no internal defects, devoid of any injurious or harmful defects;"

   b. "The bars are to have sound internal centers" and "be totally devoid of any porosity, voids, clinks, pipe and other detrimental defects."

   c. "The materials shall be suitable for general machining, upset forging, and drop forging applications as well as for any subsequent heat treatments."

   d. "Bars shall be suitable for production of quenched and tempered bars using a continuous, roller hearth, furnace."

47. Simec Acero expressly warranted that they would provide steel bars that met Magellan's Specifications by providing the Feasibility Analysis to Magellan.

48. Simec Acero accepted the Purchase Orders and expressly warranted they could meet Magellan's Specifications by shipping the Non-complying Goods.

49. Simec Acero failed to deliver goods that complied with these express warranties by failing to deliver steel products that were free from internal voids, had internally sound centers, and were suitable for heat treatment.

50. Despite Magellan's demands to perform under the terms of the warranty, Simec Acero failed to take any action to perform under the terms of the warranty.

10

51. Magellan has been damaged as a result, in excess of $75,000 and in an amount to be proven at trial.

## COUNT III
### Breach of Implied Warranty of Merchantability

52. The allegations of paragraphs 1 – 35 are repeated and realleged as if fully set forth in Paragraph 52 of Count III.

53. Magellan issued the Purchase Orders to Simec Acero soliciting Simec Acero to provide steel products based on the mutually agreed upon specifications that identified the Non-complying Goods as "Special Bar Quality," meaning that the Non-complying Goods would likely be used in challenging and high stress applications, and they would likely need to be heat treated.

54. Simec Acero sold Magellan the Non-complying Goods.

55. Simec Acero is a merchant with respect to the sale of steel products identified in the Purchase Orders.

56. Simec Acero delivered the Non-complying Goods, which were not merchantable at the time of their sale because they had internal flaws, lacked internally sound centers, and were unsuitable for heat treatment.

57. As a result of these issues, Magellan received reports of issues rejections from its heat treaters.

58. Magellan repeatedly notified Simec Acero about the issues with the Non-complying Goods.

59. Simec Acero failed to take any steps to remedy this situation.

60. Magellan has been damaged as a result, in excess of $75,000 and in an amount to be proven at trial.

11

55370022.1

## COUNT IV
## Breach of Implied Warranty of Fitness

61. The allegations of paragraphs 1 – 35 are repeated and realleged as if fully set forth in Paragraph 61 of Count IV.

62. Simec Acero sold Magellan the Non-complying Goods.

63. Prior to the sale of the Non-complying Goods, Simec Acero had reason to know that Magellan was relying on Simec Acero's skill or judgment to deliver steel products that were free from internal voids, had internally sound centers, and were suitable for heat treatment based on Magellan's Purchase Orders that required Simec Acero deliver SBQ bars.

64. Magellan relied on Simec Acero select steel products that were appropriate for various applications known to steel producers and distributors.

65. The Non-complying Goods were not suitable for these purposes and, as a result of the non-compliance with Magellan's specifications, Magellan received reports rejections from its heat treaters.

66. Magellan repeatedly notified Simec Acero about the issues affecting the Non-complying Goods.

67. Simec Acero failed to take any steps to remedy this situation.

68. Magellan has been damaged as a result, in excess of $75,000 and in an amount to be proven at trial.

## COUNT V
## Unjust Enrichment (in the alternative)

69. The allegations of paragraphs 1 – 35 are repeated and realleged as if fully set forth in Paragraph 69 of Count V.

70. In the event the Court finds that no contract governs this dispute, Simec Acero unjustly retained Magellan's payments for the Non-complying Goods.

71. Simec Acero's retention of those payments violates fundamental principles of justice, equity, and good conscience.

### PRAYER FOR RELIEF

WHEREFORE, Magellan respectfully requests this Court enter judgment in its favor against Defendant Simec Acero S.A. de C.V. in an amount to be determined at trial, plus interest, costs, attorney's fees, and such further relief as this Court deems just.

Dated: March 20, 2024

Respectfully submitted,

/s/ Robert J. Palmersheim
Robert J. Palmersheim
Timothy G. Parilla
Honigman LLP
155 N. Wacker Dr., Ste. 3100
Chicago, IL 60606
(312) 701-9300
rpalmersheim@honigman.com
tparilla@honigman.com

*Attorneys for Magellan Corporation*

55370022.1